IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

vs.                                           **NO.  CR 05-0432 RB**

**JESUS GUERRERO, JAVIER GOMEZ,
MOISES GUERRERO, ANGEL TORRES,
ERIC RONQUILLO, TERRENCE MCFADDEN,
AND DENISE ALEXANDER,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant McFadden's Motion to Suppress, filed on April 20, 2005.  On June 7, 2005, I held a hearing, received evidence, and heard arguments. Having considered the briefs, evidence, arguments of counsel, and being otherwise fully advised, I find that this motion should be denied.

**I.  Facts.**

On December 10, 2004, at about 3:00 a.m., a tractor-trailer entered the Interstate 25 checkpoint. Defendant Alexander was driving and Defendant McFadden was the front seat passenger. Border Patrol Agent Marcio Nuñez questioned both occupants regarding their citizenship status. Alexander and McFadden looked at each other with their mouths agape, paused, and stated that they were United States citizens.  Agent Nuñez noticed that Alexander was trembling.  Because of this odd behavior, Agent Nuñez referred the vehicle to the secondary inspection area.  Once in secondary, Alexander consented to a canine inspection.

Agent Gillette, the canine handler, asked McFadden and Alexander to step out of the truck. They complied and stood near the front of the vehicle. The dog alerted to the trailer. Agent Gillette noticed that the trailer door had a new bolt on the latch. Agent Gillette found seventy-six bundles of marijuana, weighing 189 pounds, hidden between pallets of Coca-Cola.

Agent Grado informed Alexander and McFadden that they were under arrest and took them inside the checkpoint building to a processing room. Once inside, Agent Grado advised them of their Miranda rights with Agent Nuñez as a witness. Alexander and McFadden signed standard Border Patrol forms indicating that they had been advised of, and that they understood, their rights. Alexander and McFadden did not sign the waiver of rights portion of the form. Agent Grado dated McFadden's form December 10, 2004 at 3:10 a.m. (Gov. Ex. 1.)

About fifteen minutes elapsed between the time the truck pulled into the checkpoint, and the time that Alexander and McFadden signed the forms. Alexander and McFadden were placed in separate cells inside the checkpoint building. Agent Nuñez went back outside to staff the primary checkpoint, and had no further conversations with McFadden or Alexander.

At about 7:15 a.m. on December 10, 2004, DEA Agent Joseph Montoya and Task Force Agent Rick Sullivan responded to the checkpoint. Agents Montoya and Sullivan asked Alexander if she had been advised of her rights. She replied that she had been advised of her rights. Agent Sullivan pulled out a DEA 13A card, and read Alexander her Miranda rights. (Gov. Ex. 2.) Alexander made a statement to the agents.

After the Alexander interview, at about 8:00 a.m., Agents Montoya and Sullivan met with McFadden. Agents Montoya and Sullivan asked McFadden if he had been advised of his rights. McFadden replied that he had been advised of his rights. Agent Sullivan pulled out a DEA 13A card

and read McFadden his Miranda rights. (Gov. Ex. 2.) McFadden agreed to make a statement to the agents.

At first, McFadden gave the agents a statement denying criminal activity. McFadden then paused for about five or six seconds, and then said that he would tell the agents what really happened. McFadden gave a second statement that incriminated McFadden, Jesus Guerrero, Gomez, and Moises Guerrero in the December 10, 2004 load of marijuana. McFadden identified the Guerreros and Gomez as members of a drug organization with ties to Mexican suppliers. McFadden stated that Jesus Guerrero had hired McFadden to transport the load of marijuana to Denver for $6,000.00. He also gave other incriminating information about the Guerreros and Gomez.

During the interview, Agents Montoya and Sullivan were dressed in blue jeans and casual shirts. Agent Montoya had a gun concealed in his rear waistband, and Agent Sullivan had a gun concealed on his person. During the interview, only Agents Montoya and Sullivan were present in the room with McFadden. Agents Nuñez, Grado, and Gillette were performing other tasks at the checkpoint.

McFadden was not shackled or handcuffed during the interview. Agents Montoya and Sullivan spoke in conversational tones and never pulled their guns. McFadden did not appear to be intoxicated or under the influence of drugs. McFadden was able to understand the questions and gave responsive answers. Agent Montoya told McFadden that a substantial amount of marijuana had been found in the trailer. The agents were unaware of any criminal history.

When he responded to the checkpoint, Agent Montoya was aware of a tip from El Paso regarding a tractor trailer involved in drug smuggling. After responding to the checkpoint, Agent Montoya realized that the cases might be related. Agent Montoya testified that it is common DEA

practice not to tape record interviews. The interview with McFadden lasted about 15-17 minutes. At the end of the interview, Agent Montoya told McFadden that if McFadden wanted to help himself, McFadden should ask his lawyer to contact the DEA.

The indictment charges McFadden with conspiracy to possess with intent to distribute 1000 kilograms or more of marijuana on November 30, 2004, and possession with intent to distribute 50 kilograms or more of marijuana and aiding and abetting, on December 10, 2004.

**II. Discussion.**

McFadden moves to suppress his statements on the grounds that the statements were (1) involuntary; (2) made without a knowing and voluntary waiver of Miranda rights; and (3) unrecorded. In determining whether a statement is coerced and therefore involuntary, the Tenth Circuit considers the following factors: "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997). The determination of voluntariness is based on the totality of the circumstances and none of the single factors listed above is determinative. *Id*.

McFadden claims that his statements were involuntary because he was "shocked" by the circumstances surrounding his arrest, and the agents failed to record his post-arrest statement. McFadden understood the questions and gave responsive answers. Agents Montoya and Sullivan did not threaten or menace McFadden. The interview occurred within six hours of the arrest and lasted less than twenty minutes. McFadden was advised of his rights twice and he was not subjected to physical punishment. Considering the totality of the circumstances, McFadden's statements were

4

voluntary.

McFadden claims that his Miranda waiver was invalid because he did not sign a written Miranda waiver. The government bears the burden of proving by a preponderance of the evidence that a waiver of Miranda rights was knowing, intelligent, and voluntary. *Moran v. Burdine*, 475 U.S. 412, 421 (1986). With regard to the knowing and intelligent aspect, the government must prove that the Miranda warnings were adequate and that McFadden understood his rights. *See United States v. Bustillos-Munoz*, 235 F.3d 505, 517 (10th Cir. 2000) (waiver knowing and intelligent because imperfect translation into a language which defendant understood conveyed the substance of the rights waived).

With respect to the voluntariness element, the government must establish that the waiver was a product of a free and deliberate choice rather than intimidation, coercion, or deception, and that the defendant had a full awareness, both of the nature of the right being abandoned and the consequences of the decision to abandon it. *United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998). Where a defendant's actions clearly demonstrate that he has voluntarily waived his Miranda rights, his failure to sign a waiver of rights form does not render his waiver involuntary. *Id*. The absence of a written waiver does not render the verbal waiver invalid. *United States v. Yazzie*, 188 F.3d 1178, 1193 (10th Cir. 1999).

McFadden was advised of his Miranda rights twice. Soon after 3:00 a.m., Agent Gillette read McFadden his rights and presented the rights to McFadden on a printed form. (Gov. Ex. 1.) McFadden acknowledged that he understood his rights in writing by signing the form. (*Id*.) At the beginning of his interview with Agents Montoya and Sullivan, Agent Sullivan read McFadden his rights from a standard DEA 13A card. (Gov. Ex. 2.) McFadden gave the incriminating statement.

5

The record indicates that the Miranda warnings were adequate, McFadden understood the warnings, and McFadden voluntarily waived his rights.

McFadden argues that his due process rights were violated when the agents failed to create potentially exculpatory evidence by recording his post-arrest statements. He claims that such a recording could have provided context to his pre-arrest statement, and explained the meaning of his assertions. He claims that failing to record the statements deprived him of an opportunity to establish that his post-arrest statements were not voluntary and he did not validly waive his Miranda rights.

McFadden cites to *United States v. Elliott*, 83 F.Supp.2d 637 (E.D. Va. 1999), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), in support of his claim. These cases hold that, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. These cases do not support the argument that the government had a duty to record the post-arrest statements.

Although research has not revealed a Tenth Circuit case directly on point, the First Circuit has rejected due process claims of selective recording where the defendants did not assert that the government acted in bad faith. *United States v. Brimage*, 115 F.3d 73, (1st Cir. 1997); *United States v. Chaudhry*, 850 F.2d 851, 857 (1st Cir.1988). The Seventh Circuit has observed that, "[a]s with all due process analyses, the touchstone consideration is whether the proceeding was fundamentally fair, and selective recording without more does not offend the Constitution." *United States v. Andreas*, 216 F.3d 645, 659 (7th Cir. 2000). Although these cases are not directly on point, (McFadden does not complain about selective recording), their reasoning is analogous to this case.

McFadden does not argue that the government acted in bad faith. He does not claim that the agents put words in his mouth, or that the agents' reports concerning the contents of the statements

are inaccurate. McFadden does not allege factors that would have been apparent on a recording that would support a claim of coercion. McFadden has not explained how a recording of his statements would render them exculpatory. The lack of a recording does not render the proceedings fundamentally unfair.

**WHEREFORE,**

**IT IS ORDERED** that Defendant McFadden's Motion to Suppress, filed on April 20, 2005, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**